# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 21, 2016       Decided March 7, 2017

No. 15-1299

ABM ONSITE SERVICES - WEST, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, DISTRICT LODGE W24 AND LOCAL
LODGE 1005,
INTERVENOR

———

Consolidated with 15-1347

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Douglas W. Hall* argued the cause and filed the briefs for petitioner.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*David L. Neigus* argued the cause and filed the brief for intervenor International Association of Machinists and Aerospace Workers, District Lodge W24 and Local Lodge 1005 in support of respondent. *Mark D. Schneider* and *William H. Haller* entered appearances.

Before: GRIFFITH, SRINIVASAN, and MILLETT, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This petition for review challenges the determination of the National Labor Relations Board that a union's effort to represent the workers who handle airline baggage is governed by the National Labor Relations Act and not the Railway Labor Act. In reaching its conclusion, the Board departed from its precedent without offering a rationale for its new approach. We therefore vacate the Board's order and remand the matter for further proceedings.

I

A

The National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, regulates most private-sector labor relations. Concerned, however, that labor strife in the railway and airline industries could disrupt commerce nationwide, Congress expressly carved out these industries, which were already covered by the

Railway Labor Act, from coverage under the NLRA framework when it passed the NLRA. *See id.* § 152; *see also Tex. & New Orleans R.R. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930) (remarking that "the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes").[1] The Act creates a "special scheme" for the railway and airline industries, premised on "their unique role in serving the traveling and shipping public in interstate commerce." *Verrett v. SABRE Grp., Inc.*, 70 F. Supp. 2d 1277, 1281 (N.D. Okla. 1999). Under this separate regulatory scheme, various mediation and arbitration boards work to resolve airline and railway labor disputes that could interrupt interstate commerce. *See id.*

The question of which labor scheme governs has meaningful consequences for both employers and employees. Chief among them are the different powers Congress has given the agencies that administer the relevant statutes. For example, the NLRB can initiate unfair-labor-practice proceedings and issue orders to employers, but the National Mediation Board (NMB), which administers the RLA, performs no law-enforcement function. The NMB's role is limited mainly to determining whether employees in the airline and railway industries have chosen union representation and then mediating collective bargaining. In addition, under the RLA, both employers and employees must exhaust an extended negotiation and mediation process before they can lawfully resort to self-help measures, such as unilaterally altering working conditions or calling a strike. This prolonged process

---

[1] Although the RLA initially applied only to rail carriers, "[a]ir carriers and their employees were made subject to the . . . Act in 1936." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 381 n.16 (1969) (citing 45 U.S.C. §§ 181-182).

is designed to avoid strikes and "keep transportation moving" in the specific subset of the American economy that concerns the RLA. *Pan Am. World Airways, Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 324 F.2d 217, 220 (9th Cir. 1963). Under the NLRA, by contrast, employers and employees have much more latitude to engage in self-help. Employees often prefer to organize under the NLRA, as it protects a wider array of "concerted activity" by employees than does the RLA. *See Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814, 820 (E.D.N.Y. 1997) (citing cases).

The RLA originally covered only common carriers, but Congress expanded the Act in 1934 to cover certain companies that perform transportation-related services for those carriers. As a result, a company is subject to the RLA and falls outside the jurisdiction of the NLRB if it "is directly or indirectly owned or controlled by or under common control with any carrier" and "operates any equipment or facilities or performs any service" related to transportation. 45 U.S.C. § 151. Whether a company is controlled by a carrier, however, is often unclear. Thus, "the NLRB and the NMB have, in the absence of any statute addressing the point, jointly developed their own method for determining their mutual jurisdictional question of whether the NLRA or the RLA governs" in any given case. *United Parcel Serv., Inc. v. NLRB*, 92 F.3d 1221, 1223 (D.C. Cir. 1996).

The NLRB frequently refers the jurisdictional question to the NMB for an advisory opinion and then defers to the NMB's view, based on the NMB's expertise in administering the RLA. *See United Parcel Serv., Inc.*, 318 N.L.R.B. 778, 780 (1995) (referring cases to the NMB "enables the [NLRB] to obtain the NMB's expertise on jurisdictional matters most familiar to it"), *aff'd*, 93 F.3d 1221 (D.C. Cir. 1996); *Pan Am. World Airways, Inc.*, 115 N.L.R.B. 493, 495 (1956) (explaining the NLRB's

view of the NMB's primacy in resolving jurisdictional questions that implicate the RLA). The NLRB follows this accepted practice when a party raises a colorable claim that the NLRB lacks jurisdiction. *See Spartan Aviation Indus.*, 337 N.L.R.B. 708, 708 (2002) ("When a party raises a claim of arguable jurisdiction under the RLA, the Board generally refers the case to the National Mediation Board . . . for an advisory opinion. . . ."). This practice dates back to at least 1956. *See Pan Am. World Airways, Inc.*, 115 N.L.R.B. at 495 (declining to assert jurisdiction in a case over which the NMB claimed jurisdiction). An exception exists to the general rule, however: under "long-standing practice," the NLRB will not refer jurisdictional questions to the NMB in situations where NMB precedent provides a clear answer. *United Parcel Serv., Inc.*, 92 F.3d at 1228.

B

The airlines that fly into and out of the Portland International Airport formed the Portland Airlines Consortium ("PAC" or "the Consortium") to operate the airport's baggage-handling system. Since 2011, the Consortium has retained ABM Onsite Services – West ("ABM" or "the Company"), an independent contractor, to run the system.[2] The issue in this case is whether ABM is a "carrier" under the RLA and thus falls outside the NLRB's jurisdiction. The answer turns on the degree of control that the Consortium exercises over the Company. To assess that control, it is important to understand the extent of the Consortium's contractual and practical involvement in a number of areas: how ABM employees do

---

[2] These facts are drawn from the findings made by the NLRB's regional director or come directly from the contract.

their jobs, how they are trained, what equipment they use, and even how they dress.

Most notably, the contract allows the Consortium to establish all standard operating procedures and provide all operating manuals for ABM. These manuals serve as the basis for ABM employee training. The contract also allows the Consortium to keep a close eye on the performance of ABM and its employees. For example, the Company is required to provide the Consortium with access to documents dealing with its operations, its compliance with non-discrimination laws, its operations and maintenance safety plans, and reports of on-the-job accidents.

In addition, the contract enables the Consortium to exercise influence over the Company's personnel decisions. All of the Company's staffing plans, for instance, must be approved by the Consortium before taking effect, and the Consortium's general manager must approve overtime work by ABM employees. Importantly, the Consortium also has the right to approve any changes in the Company's "key personnel," and to direct the company to remove employees from the contract. The contract does not, however, authorize the Consortium to discipline the Company's employees directly or require the Company to consult with it about discipline.

Furthermore, the contract specifies that the Consortium is to provide the Company with certain equipment, such as electric vehicles to move baggage and industrial bicycles to get around the baggage-handling system. The Consortium also must provide, free of charge, office space for the Company at the airport. Finally, the contract dictates that ABM employees meet certain appearance standards and wear uniforms that display the Consortium's logo, rather than the logo of ABM.

## C

In January 2015, the International Association of Machinists (the Union) filed a petition with the NLRB seeking to represent ABM's "jammer technicians," who ensure that passenger bags get from the airlines' ticket counters to the aircraft, and its dispatchers, who take calls from airline employees regarding baggage issues and are the primary point of contact with the airlines. The Company protested that the NLRB lacked jurisdiction over the matter because the Company was subject to the RLA, not the NLRA. In the alternative, the Company argued, the NLRB should refer the jurisdictional question to the NMB for an advisory opinion. To resolve that jurisdictional question, the NLRB's regional director held a hearing at which the Company's facility manager and branch manager testified, along with two dispatchers. The regional director found that the Consortium did not exercise control over the Company and its employees within the meaning of the RLA and concluded that the NLRB thus had jurisdiction over the matter. The Company sought review of the order by the NLRB itself, which summarily denied the Company's request and affirmed its own jurisdiction in a 2-to-1 decision. The majority determined that the petition raised "no substantial issues warranting review." J.A. 608. The dissenting member, however, was not satisfied that the Board had jurisdiction, writing that "substantial evidence [exists] that the Portland Airlines Consortium is involved in [the Company]'s personnel decisions and operations, which may have been afforded insufficient weight by the Regional Director." J.A. 608.

That same day, a majority of ABM's participating employees voted in favor of union representation. The NLRB certified the Union as the employees' collective-bargaining representative. To challenge the Board's jurisdictional ruling,

the Company refused to bargain with the Union, which drew an unfair-labor-practice charge from the Union and a complaint from the regional director of the NLRB. The NLRB granted summary judgment against the Company, which then filed this petition for review. The NLRB cross-applied for enforcement of its order, and the Union subsequently intervened.

We have jurisdiction under 29 U.S.C. §§ 160(f) and 160(e).

II

This case turns on the fundamental principle that an agency may not act in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The NLRB has violated that cardinal rule here by applying a new test to determine whether the RLA applies, without explaining its reasons for doing so. Because an agency's unexplained departure from precedent is arbitrary and capricious, we must vacate the Board's order. *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (citing *Pontchartrain Broad. Co. v. FCC*, 15 F.3d 183, 185 (D.C. Cir. 1994)).

A

Any company that is "directly or indirectly owned or controlled by" an airline is governed by the RLA, 45 U.S.C. § 151, provided that the company's employees do work "that is traditionally performed by employees of . . . air carriers," *Air Serv Corp.*, 33 N.M.B. 272, 284 (2006). No party takes issue with the NMB's interpretation on that latter point or disputes that ABM employees do work that is traditionally performed by employees of air carriers. As a result, because ABM is not

owned by air carriers, the only question in this case is whether it is controlled by them.

In 1980, the NMB began "an extensive evaluation of its jurisdictional standards," including on the issue of control, "in light of changing corporate relationships and increasing use of contractors to perform work integral to rail and air transportation." *Bhd. Ry. Carmen of the U.S. & Can.*, 8 N.M.B. 58, 61 (1980). Over the ensuing years, the NMB developed a list of six factors to guide it in determining whether a company is controlled by an air carrier. *See, e.g.*, *Miami Aircraft Support*, 21 N.M.B. 78, 81 (1993). As stated most directly by the NMB in 2006, the agency looked to (1) the extent of the carrier's control over the manner in which the company conducts its business; (2) the carrier's access to the company's operations and records; (3) the carrier's role in the company's personnel decisions; (4) the degree of carrier supervision of the company's employees; (5) whether company employees are held out to the public as carrier employees; and (6) the extent of the carrier's control over employee training. *See Air Serv Corp.*, 33 N.M.B. at 285.

As framed by the NMB in that case, the "standard for satisfying" this test was "the *degree of influence* that a carrier has over discharge, discipline, wages, working conditions and operations," as opposed to any kind of requirement "that a carrier hire, fire, set wages, hours and working conditions of contractor employees." *Id.* (emphasis added); *see also Roca v. Alphatech Aviation Servs., Inc.*, 961 F. Supp. 2d 1234, 1240 (S.D. Fla. 2013) (explaining that control under the RLA would exist under the "NMB's . . . test [when the] 'carrier controls the details of the day-to-day process by which the contractor provides services—for example, the number of employees assigned to particular tasks, the employees' attire, the length of their shifts, and the methods they use in their work.'" (quoting

*Cunningham v. Elec. Data Sys. Corp.*, No. 06-cv-3530 (RJH), 2010 WL 1223084, at *6 (S.D.N.Y. Mar. 30, 2010))). In other words, for the NMB to find the type of control that would trigger the jurisdiction of the RLA, an air carrier did not have to dictate decisions over employee discharge, discipline, wages, working conditions, and operations; it simply had to exercise some significant influence over those aspects of the employment relationship.

Under this test, ABM would plainly fall under the control of air carriers. The NLRB does not even attempt to argue otherwise. Indeed, the NMB previously found control and jurisdiction with facts similar to these for many airline-services contractors. In fact, according to one commentator, the NMB "found RLA jurisdiction in all but one of over thirty [such] airline-control cases" it considered between the mid-1990s and 2011. Brent Garren, *NLRA and RLA Jurisdiction over Airline Independent Contractors: Back on Course*, 31 ABA J. LAB. & EMP. L. 77, 93 (2015).

*Air Serv Corp.* is an especially clear example of how that agency used to find carrier control over contractors like ABM. With apologies to the reader for the lengthy excerpt, the NMB's discussion of the key facts in *Air Serv* shows that there is little daylight between that contractor's situation and ABM's:

> United's flight schedules affect the work schedules of Air Serv employees. United establishes a minimum level of staffing. United provides and repairs the equipment used by Air Serv to service the Carrier's aircraft. United provides many of the supplies Air Serv uses to service the aircraft. United specifies the cleaning supplies which must be used to clean

its aircraft. In order to perform periodic security and safety audits, United has access to Air Serv's records regarding personnel, maintenance, and training. United's [internal] regulations appear, by reference, to be an extensive set of regulations and standards that must be adhered to under the terms of the Services Agreement. Through [its internal] regulations[,] United dictates the cleaning guidelines and procedures for servicing the aircraft. Air Serv has very little discretion concerning how or when to provide service.

Although Air Serv supervises its own employees, United exercises a great deal of control over Air Serv employees through its comprehensive monitoring of the contract's performance. This monitoring includes: monetary performance penalties, minimum staffing levels, daily vendor meetings, detailed . . . regulations and regular audits.

*Air Serv Corp.*, 33 N.M.B. at 285-86.

Indeed, there is no meaningful distinction between the control United exercised over Air Serv and the control carriers exercise over ABM. Here, the carriers' flight schedules determine the work schedules of the Company's employees. The Consortium decides when, where, and how many employees work at a time. It provides much of the equipment the Company uses, along with office space. The Consortium specifies the exact procedures by which ABM employees do their jobs, and it has access to ABM employee-training and qualifications records. The Consortium's general manager directly trains ABM employees on bag hygiene, and when the

general manager does not do the training himself, the Consortium still provides the training materials and dictates the procedures to be followed. And even though ABM supervises its own employees, the Consortium wields a great deal of influence in practice through its comprehensive monitoring of the contract's performance. If anything, carriers appear to exercise more control over ABM than United did over Air Serv, given the Consortium's contractual right to approve changes in key ABM personnel, its control over the appearance of ABM employees, and the fact that the Consortium places its own logo on ABM employees' uniforms.

Had the NLRB followed the NMB's analysis in *Air Serv*, there is no question that ABM would be covered by the RLA and that the NLRB would have no jurisdiction over this labor dispute. Indeed, even in prior cases where carrier influence over personnel decisions was a factor weighing in favor of a finding of control, the NMB never went so far as to hold that the ability to *discipline* or *discharge* company personnel was necessary or even that it was a factor to be given significantly greater weight than the others. *See, e.g.*, *Complete Skycap Servs., Inc.*, 31 N.M.B. 1, 5 (2003) (listing the fact that carriers "may request removal of an employee" as merely one of the many factors favoring a finding of control). Moreover, in the past, the NMB had found control even where there was no indication that an airline "ha[d] the right to request employee discipline or removal" and where "there [was] no evidence that [the airline] ha[d] []ever requested [the contractor] to discipline or remove an employee." *Kanonn Serv. Enters. Corp.*, 31 N.M.B. 409, 417 (2004).[3] If the ability to dictate personnel actions (especially negative ones) had been a necessary

---

[3] The NMB has never directly overruled or even disavowed these decisions. *See* Garren, *supra*, at 102-03.

condition for finding RLA-level control, the NMB would have reached the opposite result in such cases. By the same token, had the NLRB followed the reasoning used in those cases here, it would have concluded that the RLA governed the dispute with ABM even though the airlines cannot discipline or effectively fire ABM's employees.

In a clear departure from precedent, however, the NMB in 2013 began requiring that air carriers exercise a substantial "degree of control over the firing[] and discipline of a company's employees" before it would find that company subject to the RLA. *Huntleigh USA Corp.*, 40 N.M.B. 130, 137 (2013); *see also Aero Port Servs., Inc.*, 40 N.M.B. 139, 143 (2013) (finding that a cargo-screening company was not subject to air-carrier control, based on a lack of direct involvement by the airlines in employee discipline).[4] The NMB made no effort to explain this change to its test for RLA jurisdiction. The agency expanded on this approach later that year in *Bags, Inc.*, where it found especially relevant that the employer made the final disciplinary decisions, even though airlines could provide "input" into the process. *See* 40 N.M.B. 165, 170 (2013). The NMB determined that meaningful control was lacking even though, in this line of cases, carriers provided training and operating-procedure manuals, *Menzies Aviation, Inc.*, 42 N.M.B. 1, 2 (2014); determined staffing levels, *id.* at

---

[4] The NMB also emphasized that Aero Port Services' contract involved "the type of control expected in nearly any contract for services." 40 N.M.B. 139, 143 (2013). Although the NMB did not explain what a typical contract for services looks like, it subsequently recited similar language in *Bags, Inc.*, where it observed that "the type of control exercised by the [airlines] over [the employer] is found in almost any contract between a service provider and a customer." 40 N.M.B. 165, 170 (2013). The NMB has continued to use this language ever since. *See Menzies Aviation, Inc.*, 42 N.M.B. 1, 4, 7 (2014); *Airway Cleaners, LLC*, 41 N.M.B. 262, 268 (2014).

4; *Aero Port Servs.*, 40 N.M.B. at 141; controlled scheduling, *Bags, Inc.*, 40 N.M.B. at 170; provided equipment and space, *id.*; *Menzies Aviation*, 42 N.M.B. at 2; recommended promotions, *Airway Cleaners, LLC*, 41 N.M.B. 262, 266 (2014); and possessed veto authority over material changes to contractors' staff, *id.* at 265.

We are not the first to remark on this shift in the NMB's analysis. In an order issued just two months before the NLRB granted summary judgment against ABM, an NLRB member observed "that in . . . recent cases, the National Mediation Board . . . ha[d] issued advisory opinions to the NLRB declining jurisdiction, despite air carriers providing detailed specifications as to the employer's performance of work traditionally performed by carriers (and their auditing that performance)." *Primeflight Aviation Servs., Inc.*, 12-RC-113687, 2015 WL 3814049, at *1 n.1 (June 18, 2015) (describing the view of Board Member Harry I. Johnson, III). In that member's assessment, "these cases represent[ed] a shift by the NMB from earlier opinions in which it had asserted jurisdiction on similar grounds." *Id.*

In 2014, a member of the NMB noted the same change: "In recent cases where the [National Mediation] Board has declined to find jurisdiction over similar companies, it [has] generally relied on the absence of substantial control over 'the firing and discipline of a company's employees . . . .'" *Airway Cleaners*, 41 N.M.B. at 275-76 (2014) (Geale, Mem., concurring in part and dissenting in part) (quoting *Huntleigh USA Corp.*, 30 N.M.B. at 137). "Those cases," Board Member Nicholas Geale explains, "appear to overly emphasize that aspect compared to [earlier] NMB precedent." *Id.* Member Geale reiterated those concerns later that year, dissenting from another NMB advisory opinion. *See Menzies Aviation, Inc.*, 42 N.M.B. at 8 (Geale, Mem., dissenting) (confessing "difficulty

understanding what, if any, evidence could convince [the NMB] of coverage under our traditional . . . test"). The NMB's decision to find no control in *Menzies Aviation* is remarkable in light of its prior decisions because, as Member Geale observes, the airline in that case had the right to demand the removal of particular vendor employees from the contract. *See id.* (Geale, Mem., dissenting). These cases and commentary from members of both boards demonstrate that, under the test the NMB now applies, the NMB will not find control for RLA purposes if the contractor is ultimately allowed "to determine the appropriate discipline" for its own employees. *See id.* at 6 (majority opinion). That rule is impossible to square with cases from just a few years earlier. *Cf.* Garren, *supra*, at 103 (noting that the NMB's decisions in *Airway Cleaners* and other recent cases "seem[] inconsistent with [the] more than thirty decisions from 1996-2011 that found RLA jurisdiction" under similar facts).

In ABM's case, the NLRB found "that the record did not establish whether an employee's removal from service" at the airport—which the Consortium has the right to request or require under certain circumstances—"would effectively result in the employee's discharge" from the company. J.A. 568. The NLRB also emphasized that the Company "conducts its own investigations of [its] employees" before doling out discipline. J.A. 568. Under those facts, the most recent NMB precedent (on its own) might justify the NLRB's determination that carriers exercise insufficient control over ABM for the RLA to apply. *See Menzies Aviation*, 42 N.M.B. at 6 (explaining that "the authority to remove employees" from a contract is relevant only when "an employee has been *terminated* following a carrier request that he or she be removed from the contract" (emphasis added)). After all, it is far from clear that the Consortium has the power to determine discipline for ABM

employees or to ensure that those employees are *fired* from the Company (and not just removed from service at the airport).

And that is the very reasoning the NLRB used to conclude that the RLA did not apply here. *See* J.A. 571 (citing *Menzies Aviation, Inc.*, 42 N.M.B. 1; *Airway Cleaners*, *LLC*, 41 N.M.B. 262; and *Bags, Inc.*, 40 N.M.B. 165) (finding PAC's ability to discipline and discharge ABM employees lacking and observing "that the degree of control that PAC has over [ABM] is contractually no greater than the type of control exercised in a typical subcontractor relationship"). Yet the NMB never expressly disavowed its precedent that took all six factors into account when determining whether a carrier controlled a contractor. Nor did the NMB ever explain why it decided to replace that traditional approach with an analysis that emphasized carrier control of discipline and discharge. Given the NLRB's previous endorsement of the prior approach, *see, e.g.*, *Aircraft Serv. Int'l Grp.*, 342 N.L.R.B. 977 (2004), it was not enough for the NLRB simply to follow suit without an explanation for why it, too, was leaving behind settled precedent.

B

The NLRB claims that "the NMB has primary authority to interpret the RLA," Oral Arg. Tr. 30:6-7, and readily acknowledges that its practice is "to apply the NMB's test," *id.* at 26:22-23. Indeed, the NLRB has for years hitched its wagon to the NMB's star, including in formal, published opinions. *See, e.g.*, *Aircraft Serv. Int'l Grp.*, 342 N.L.R.B. at 977. When the NLRB first adopted and applied the NMB's traditional test, it bound itself to continue doing so; any deviation would require a reasoned explanation. In finding that it had jurisdiction over the Company, however, the NLRB relied exclusively on the NMB's most recent precedent—silently

elevating the airlines' power over personnel decisions to dispositive status.

It is well-settled that the NLRB—like any other agency—cannot "turn[] its back on its own precedent and policy without reasoned explanation." *Dupuy v. NLRB*, 806 F.3d 556, 563 (D.C. Cir. 2015); *see also E.I. Du Pont de Nemours & Co. v. NLRB*, 682 F.3d 65, 70 (D.C. Cir. 2012) (explaining that the NLRB must "give a reasoned justification for departing from its precedent"). Generally speaking, "the requirement that an agency provide reasoned explanation for its action . . . demand[s] that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And if "a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument." *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004). Thus, when the Board fails to explain—or even acknowledge—its deviation from established precedent, "its decision will be vacated as arbitrary and capricious." *Manhattan Ctr. Studios, Inc.*, *v. NLRB*, 452 F.3d 813, 816 (D.C. Cir. 2006).

Because the NLRB follows the NMB's lead in interpreting and applying the RLA, the question becomes how to treat an unacknowledged and unexplained deviation from precedent by the NLRB that is precipitated by a likewise unacknowledged and unexplained deviation from precedent by the NMB. We hold that, under such circumstances, the NLRB is not free to simply adopt the NMB's new approach without offering a reasoned explanation for that shift. Indeed, an agency cannot avoid its duty to explain a departure from its own precedent simply by pointing to another agency's unexplained departure from precedent. This is a corollary of the rule that an agency

cannot justify a departure from its precedent simply by pointing to another one of its cases that departed from precedent, if that other case does not itself announce the new standard or a supporting rationale for it. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1128-29 (D.C. Cir. 2003) (citing *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981)).

In short, the NLRB should have recognized that longstanding NMB precedent—which the NLRB previously followed—compelled a finding of control in this case. The NLRB may have fairly read recent NMB opinions to require greater carrier control over personnel matters than the record evinced here. But rather than ignore the NMB's earlier precedent, which it had effectively adopted as its own, the NLRB was obligated to consider that precedent and acknowledge the conflict in this case. *See Hatch*, 654 F.2d at 834-35 (requiring "explicit recognition by [an agency] that the standard has been changed" and a genuine "attempt to forthrightly distinguish or outrightly reject apparently inconsistent precedent"). At that point, the NLRB would have had two options. First, it could have attempted to offer its own reasoned explanation for effectively whittling down the traditional six-factor test. It would have needed to explain why such a change was appropriate, how the new test reasonably interprets the RLA, and why the NLRB has decided to determine for itself the appropriate test rather than keeping with its past practice of referring such questions to the NMB and deferring to their formulation of the test for RLA jurisdiction. Or the NLRB could have simply referred this matter to the NMB and asked that agency to explain its decision to change course. If the NLRB were persuaded, it could then have adopted the NMB's explanation as its own. The NLRB, however, followed neither path. As a result, we must vacate the NLRB's order as arbitrary and capricious.

At oral argument, counsel for the NLRB was asked what the appropriate remedy would be if the Board had in fact applied a new test without explanation. Counsel suggested that, on remand, it would be up to the NLRB to provide some explanation justifying the new test or to identify another agency that could. *See* Oral Arg. Tr. 24:1-6. We agree. Either scenario is preferable to the present state of affairs, in which both employers and employees are caught in a web of conflicting precedent on the issue of RLA jurisdiction.

## III

We grant the Company's petition for review and deny the NLRB's cross-application for enforcement. We vacate the NLRB's order and remand for further proceedings consistent with this opinion.

*So ordered.*