# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 13, 2016       Decided April 18, 2017

No. 15-1321

ALLIED AVIATION SERVICE COMPANY OF NEW JERSEY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LOCAL 553, I.B.T.,
INTERVENOR

Consolidated with 15-1360

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

*Gregory S. Lisi*, pro hac vice, argued the cause for petitioner. On the brief was *Justin P. Fasano*.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate

General Counsel, and *Robert J. Englehart* and *Usha Dheenan*, Supervisory Attorneys.

*Jae W. Chun* argued the cause for intervenor. With him on the brief was *Eugene S. Friedman*.

Before: BROWN, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Allied Aviation Services Company of New Jersey (Allied) is a commercial airline fuel service provider with operations throughout the United States. Since 2012, a swath of Allied's employees at Newark Liberty International Airport has sought representation by and collective bargaining through Local 553, International Brotherhood of Teamsters, AFL-CIO (the Union). Allied challenges the National Labor Relations Board's (NLRB) decision that Allied violated the National Labor Relations Act (NLRA) by failing to recognize and bargain with the Union.

When the Union first sought to represent the employees at issue, Allied argued that these employees, whose job titles all include the word "Supervisor," are statutory supervisors exempt from the Act. When the Board rejected that argument on the ground that the work of the relevant employees was not in fact supervisory within the meaning of the NLRA, Allied fell back on assertions that the Board lacked jurisdiction over the company because its work is so extensively directed by common carriers that Allied is governed not by the NLRA but by the Railway Labor Act (RLA). The Board rejected that claim for want of record evidence that Allied is "owned or controlled by or under common control with" a common carrier, as the RLA requires. 45 U.S.C. § 151 First. Allied

alternately maintained, unsuccessfully, that it cannot be held to Board orders invalidated by *Noel Canning v. NLRB*, 134 S. Ct. 2550 (2014), despite a duly empowered Board's ratification of those orders.

Allied petitions this court for review. We hold that Allied's petition fails to establish RLA jurisdiction; that a constitutionally adequate Board panel's certification of the Union as the employees' representative cured any defect in the Board's earlier order; and that substantial evidence supports the Board's statutory-supervisor classifications. Because the Board's decision is legally correct and supported by substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement.

## I.    Background

The Port Authority of New York and New Jersey contracted with Allied to provide fueling services to approximately fifty airlines at Newark Liberty International Airport. At issue in this case is a group of forty-four of Allied's employees who seek representation by the Union. They include Fueling Supervisors (including Dispatch and Operations Supervisors), Tank Farm Supervisors, Maintenance Supervisors (including Parts Supervisors and Parts Persons), and Training Supervisors. These employees generally ensure the smooth provision of fuel service at Newark Airport. Fueling Supervisors distribute the equipment and workload to the fuelers and ensure that airlines' fueling needs are fulfilled. Tank Farm Supervisors monitor storage and supply facilities (the fuel storage "tank farm"), the airport's fuel pipeline system, and the inventory, inflow, and outflow of fuel. Maintenance Supervisors keep track of Allied's fleet of gas tankers and their maintenance. And Training Supervisors train fuelers on the procedures mandated by each airline. These

"Supervisors" are overseen by each department's managers, who report in turn to a General Manager.

## A. Election Petition

In March 2012, the Union filed a petition seeking to represent these forty-four employees. Allied opposed the petition and argued that the employees are supervisory within the meaning of section 2(11) of the NLRA and therefore exempt from its coverage. The NLRA explicitly exempts supervisors from its definition of a covered "employee" eligible to unionize, 29 U.S.C. §§ 152(3), (11), but it is job function, not title, that confers supervisory status, *see Jochims v. NLRB*, 480 F.3d 1161, 1168 (D.C. Cir. 2007).

Statutory supervisors are those with authority to act "in the interest of the employer" to carry out or "effectively to recommend" at least one of twelve enumerated activities, provided that the exercise of that authority requires "the use of independent judgment." 29 U.S.C. § 152(11); *see NLRB v. Health Care & Ret. Corp.*, 511 U.S. 571, 573-74 (1994). The twelve activities are: "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action." 29 U.S.C. § 152(11). The party asserting supervisory status bears the burden of proof on the point. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711-12 (2001).

After five days of testimony on the issue, NLRB Regional Director J. Michael Lightner found that the Allied workers in question were non-supervisory employees and directed an election in the petitioned-for bargaining unit. Allied sought Board review of the non-supervisory designation. The company also contended that recess appointments made to the

NLRB in January 2012 were invalid. In June 2012, a three-member panel of the Board affirmed the direction of election except that, because it thought there was a substantial issue whether Training Supervisors were statutory supervisors, the panel permitted those three employees to vote only by challenged ballot, meaning that the Training Supervisors' ballots would not be opened or counted unless the election was so close that their votes might change its results. If it became clear that only with their votes might the Union gain a majority, the administrative law judge (ALJ) would have to take further evidence and determine whether the Training Supervisors were statutory supervisors before opening and counting their ballots. In a footnote, the Board rejected Allied's challenge to the 2012 recess appointments.

The Supreme Court's decision in *Noel Canning v. NLRB*, 134 S. Ct. 2550 (2014), later invalidated the appointments of two of the three panel members that issued the 2012 order. That holding meant the Board lacked a quorum from January 4, 2012, to August 5, 2013. Thus, in retrospect, the panel acted without authority. On December 3, 2013, however, another Board panel, whose members had all been validly appointed, considered the record in light of Allied's objections, including those urged on the 2012 panel, and certified Union representation.

Meanwhile, on June 7, 2012, the Union won a tight election. Without the three Training Supervisors' votes, the employees voted 21-20 in favor of representation. An ALJ then heard an additional day of testimony and accepted post-hearing briefing on whether the Training Supervisors qualified as statutory supervisors. During the hearing, the parties reversed their initial positions to align with their preferences on representation. Allied argued that the Training Supervisors should be considered non-supervisory, so eligible to participate

in the election, such that their votes would defeat union representation. The Union argued that the Training Supervisors were statutory supervisors whose votes should be excluded, allowing the Union to be recognized. Accordingly, the Union now bore the burden of proving supervisory status.

The ALJ found that the Training Supervisors "effectively…recommend" hiring within the meaning of the Act: The Training Supervisors had the authority to make recommendations regarding hiring of probationary employees, the Training Supervisors' assessments drew on their own independent judgment, and Allied management routinely adhered to the Training Supervisors' recommendations without independent investigation. In the ALJ's judgment, the Training Supervisors were therefore supervisory under the Act.

Allied took exception to the ALJ's decision, arguing that there was insufficient evidence of supervisory authority and that it was error to classify the Training Supervisors differently from the other petitioned-for employees that the 2012 Board panel had held were non-supervisory. As noted, a duly-constituted three-member Board panel considered the record, including the earlier Board order, in light of Allied's objections. The Board panel certified the Union as the workers' representative on December 3, 2013.

Not once during the entire election proceeding did Allied argue that it was subject to the jurisdiction of the RLA rather than the NLRA. In fact, when asked directly by the hearing officer in March 2012 whether the company was subject to RLA jurisdiction, counsel for Allied responded, "Not that I know of. I would have to look into that." J.A. 141. However, it appears that neither during the ensuing five days of hearings nor during the following two years of proceedings before the

Board did Allied "look into" the question or make any mention whatsoever of any objection to the NLRB's jurisdiction.

## B. Unfair Labor Practices Case

On April 22, 2014, the Union charged Allied with refusal to negotiate a collective-bargaining agreement in violation of sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (5). Accordingly, the Board's General Counsel filed an unfair labor practices complaint against Allied. Allied admitted that it refused to bargain, but contended it had no obligation to do so because the Board erred in certifying the unit. The Board's General Counsel moved for summary judgment and the Board directed Allied to show cause why summary judgment should not be granted. Allied then also asserted, for the first time in the years-long dispute, that Allied is under the direct control of a common carrier, making it an employer subject to RLA jurisdiction and therefore beyond the NLRB's jurisdiction. It also pressed its constitutional recess-appointment claim and its statutory challenge to the Board's classification of unit members as non-supervisors. The Board held in the Union's favor and ordered Allied to bargain.

## II. Analysis

### A. Allied Has Not Shown that it is Subject to RLA Jurisdiction, so Exempt from the NLRA

We turn first to Allied's contention that it is not bound by the Board's orders because it is an RLA employer exempt from the NLRA. The NLRA protects the rights of employees to organize and bargain collectively, *see* 29 U.S.C. §§ 151, 157, but expressly exempts employers "subject to the Railway Labor Act" and "any individual employed by an employer subject to the Railway Labor Act" from its reach, *id*. §§ 152(2)-

(3). RLA employers include rail carriers, common air carriers, and "any company which is directly or indirectly owned or controlled by or under common control with any carrier." 45 U.S.C. §§ 151 First, 181.

The distinction between coverage under the NLRA and the RLA is significant for employers and employees. Each Act protects employees' right to join together to improve working conditions and facilitates labor-management relations. But because of the central role in the national economy of smooth operation of the nation's rail and air carriers, the RLA places a higher priority than the NLRA on avoiding strikes or lockouts. To that end, the RLA requires more extensive dispute-resolution efforts before either employer or employee can take unilateral action. *See ABM Onsite Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1139-40 (D.C. Cir. 2017).

The National Mediation Board (NMB), which administers the RLA, employs a two-part "function and control" test to determine whether an employer that is not itself a carrier is sufficiently controlled by a carrier to be subject to RLA jurisdiction. *See Signature Flight Support of Nev.*, 30 N.M.B. 392, 399 (2003). The conjunctive test asks (1) "whether the nature of the work is that traditionally performed by employees of rail or air carriers," and (2) "whether the employer is directly or indirectly owned or controlled by, or under common control with a carrier or carriers." *Id*. To determine whether an employer is under the control of a rail or air carrier, the NMB traditionally considers six factors:

> (1) the extent of the carrier's control over the manner in which the company conducts its business; (2) the carrier's access to the company's operations and records; (3) the carrier's role in the company's personnel decisions; (4) the degree of carrier

supervision of the company's employees; (5) whether company employees are held out to the public as carrier employees; and (6) the extent of the carrier's control over employee training.

*ABM Onsite*, 849 F.3d at 1142.

The Board and the NMB each has independent authority to decide whether the RLA bars the NLRB's exercise of jurisdiction. *See id*. at 1140; *United Parcel Serv., Inc. v. NLRB*, 92 F.3d 1221, 1224-26 (D.C. Cir. 1996). When presented with a claim of RLA jurisdiction, the Board's stated practice is to refer the parties to the NMB and dismiss the charge or petition in cases in which it is clear the employer is subject to the RLA; to retain cases in which RLA jurisdiction is clearly lacking; and, because the NMB has particular expertise in administering the RLA, to refer close cases of arguable RLA jurisdiction to the NMB for its advisory opinion before the NLRB itself decides the issue. *See* NLRB CASEHANDLING MANUAL, PART 2: REPRESENTATION PROCEEDINGS, § 11711.1-11711.2 (Jan. 2017); *ABM Onsite*, 849 F.3d at 1140; *Fed. Express Corp.*, 317 N.L.R.B. 1155, 1156 & n.6 (1995). There is, however, "no statutory requirement that the Board first submit a case to the NMB for an opinion prior to determining whether to assert jurisdiction." *Spartan Aviation Indus., Inc.*, 337 N.L.R.B. 708, 708 (2002); *accord United Parcel Serv.*, 92 F.3d at 1224-26.

The Board rejected Allied's belatedly-raised claim of RLA jurisdiction because the record evidence did not establish the requisite carrier control. *Allied Aviation Serv. Co. of N.J.,* 362 N.L.R.B. No. 173, 2015 WL 4984885, at *1-2 (Aug. 19, 2015). We hold that the Board's decision that Allied failed to establish the "control" portion of the "function and control" test is legally correct and supported by substantial evidence. We thus need not decide how the other element—whether Allied's

employees' work is of a nature traditionally performed by air carrier employees—would apply here.

The lack of record evidence of carrier control is not surprising. Allied missed chances to build a record on the issue by failing to object to NLRB jurisdiction until after the factual record had been developed. As noted above, when prompted by the hearing officer during the 2012 supervisory-status hearing, counsel for Allied failed to embrace or follow up on the suggestion that the company might be an RLA employer. Allied did not mention RLA jurisdiction again until its June 30, 2014, response to the Board's order to show cause—more than two years after the unit members' supervisory status had been litigated and the representation election concluded.

Indeed, it is plausibly suggested that Allied's RLA jurisdiction argument was forfeited because Allied never argued to the Board that it applied the wrong carrier-control analysis. *See* Local 553 Intervenor Br. at 4-7. This court may not consider objections not properly raised before the Board, by motion for reconsideration or otherwise, in the absence of "extraordinary circumstances." 29 U.S.C. § 160(e), *see* 29 C.F.R. § 102.46(b)(1), (b)(2), (d); *Alden Leeds, Inc., v. NLRB*, 812 F.3d 159, 166-67 (D.C. Cir. 2016); *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 371-72 (D.C. Cir. 2016). Even arguments against NLRB jurisdiction are subject to section 10(a)'s preservation requirement unless the Board acted patently beyond its jurisdiction, or "outside the orbit of its authority" such that there is "no order to enforce." *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 388 (1946); *accord Noel Canning v. NLRB*, 705 F.3d 490, 498 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2550 (2014); *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009); *Noel Foods v. NLRB*, 82 F.3d 1113, 1121 (D.C. Cir. 1996). But we need not decide whether Allied forfeited its bid for the NLRB to dismiss this case in

order that it might be reheard before the NMB because the record clearly supports the NLRB's exercise of jurisdiction.

Allied argues that the Board misapplied precedent by granting too much weight to a single carrier-control factor—the carrier's role in personnel decisions. Allied does not articulate the applicable standard of review, but its argument amounts to a claim that the Board arbitrarily and capriciously misapplied precedent. *See ABM Onsite*, 849 F.3d at 1142. We therefore review whether the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We discern no such error here.

Contrary to Allied's contention, the Board did not rely on only a single factor. The Board's analysis was more extensive. When evaluating whether Allied was under the direct or indirect control of air carriers, the Board first acknowledged that recent NMB decisions "emphasized in particular the absence of [carrier] control over hiring, firing, and/or discipline." *Allied Aviation Serv. Co. of N.J.*, 362 N.L.R.B. No. 173, 2015 WL 4984885, at *1. Allied did not argue that any carrier controlled its personnel decisions, nor, in the Board's view, did the record contain evidence to support such a claim. *Id.* at *2. The Board also specifically observed that the record evidence fell "substantially short of the considerations relied upon" in dissents written by Member Geale in two separate cases: *Airway Cleaners, LLC*, 41 N.M.B. 262 (2014), and *Menzies Aviation, Inc.*, 42 N.M.B. 1 (2014). *See* 362 N.L.R.B. No. 173, 2015 WL 4984885, at *2. Those considerations include all six factors relevant to carrier control. *See Airway Cleaners*, 41 N.M.B. at 267, 274-77 (Geale, M., concurring in part and dissenting in part) (concluding that there was carrier control in view of evidence relating to "several factors, including the extent of the carrier's control over the manner in

which the company conducts its business, access to the company's operations and records, role in personnel decisions, degree of supervision of the company's employees, whether employees are held out to the public as carrier employees, and control over employee training"); *Menzies Aviation, Inc.*, 42 N.M.B. at 7-8 (Geale, M., dissenting) (applying his *Airway Cleaners* analysis to similar facts). By contrasting the evidence in this case to the treatment in Member Geale's dissents, the Board acknowledged the relevance of all of the factors and concluded that Allied's evidence fell short even under the traditional six-factor test. The Board's decision was not an arbitrary or capricious misapplication of precedent, but adequately considered and weighed all the evidence before it that was relevant to carrier control.

The Board's decision is therefore distinguishable from the one we recently considered in *ABM Onsite*. There, we held that the Board had departed from past precedent by effectively treating control over personnel decisions as "necessary" to establish carrier control. *ABM Onsite*, 849 F.3d at 1144. We concluded that if the Board had applied the traditional six-factor test, the petitioner "would plainly fall under the control of air carriers." *Id.* at 1143.

In contrast, the record in this case confirms that the Board's factual findings regarding carrier control were supported by substantial evidence. *See* 29 U.S.C. § 160(f). Allied presented no evidence that it was under contract with any common carrier, nor did it identify any case in which an employer without a carrier contract was subject to RLA jurisdiction. Instead, the only contract the record refers to—fleetingly—is Allied's "performance driven" contract with the Port Authority. J.A. 56, 234. The Port Authority is not a carrier for RLA purposes. *See Bombardier Transit Sys. Corp.*, 32 N.M.B. 131, 146 (2005). We need not here decide whether an

employer must contract directly with a carrier to be subject to RLA jurisdiction, but we note that the lack of such a contract here undermines an already sparse record on the carrier-control issue.

Allied presented no evidence that the carriers at Newark Airport hold out Allied employees to the public as their own employees, exercise control over how Allied runs its operations, supervise Allied employees to a degree sufficient to establish control, or exert meaningful control over Allied's personnel decisions. *Cf. Aircraft Servs. Int'l Grp., Inc.*, 33 N.M.B. 258, 266-67, 270-71 (2006) (finding RLA jurisdiction where record showed carrier had "daily interaction" with employees at issue, including mechanics who "deal exclusively with Carrier personnel in performing their duties"); *Empire Aero Ctr., Inc.*, 33 N.M.B. 3, 10 (2005) (finding RLA jurisdiction where, *inter alia*, carrier individually approved or rejected each employee assigned to its projects). Allied argues that its supervisory staffing decisions are subject to review and approval by a fueling committee "made up of representatives of every common air carrier operating out of Newark" Airport. Pet'r Br. at 26-27. But the record is devoid of evidence of the composition of the fueling committee, whether it contains any, let alone a controlling bloc of, common air carrier representatives, or the extent of any authority the fueling committee may have to control Allied's staffing decisions. *Cf. Aircraft Servs. Int'l, Inc.*, 352 N.L.R.B. 137, 139 (2008) (finding substantial carrier control over staffing levels and hours worked); *Aircraft Servs. Int'l Grp, Inc.*, 342 N.L.R.B. 977, 977 (2004) (finding carrier control where employer complied with carrier request not to hire certain persons and carriers directly rewarded good employee service).

**B. Allied's *Noel Canning* Challenge Fails**

Allied next contends that *Noel Canning v. NLRB*, 134 S. Ct. 2550 (2014), by invalidating the appointments of two of the three panel members that directed the election in 2012, *id*. at 2578, vitiates all Board proceedings against it. *See* Pet'r Br. at 33-34. We disagree and hold that when the duly-constituted panel certified Union representation in 2013 it ratified the 2012 panel's direction of election, thereby remedying the identified defect. The 2013 Board panel certified the Union as representative after considering the record and all of Allied's exceptions to certification, including the arguments Allied raised before the 2012 panel. *See* Decision and Certification of Representative, 22-RC-077044 (Dec. 3, 2013), J.A. 1358-60; *see also* Employer's Exceptions to Administrative Law Judge Recommended Decision on Challenged Ballots at 30-32, 22-RC-077044 (Feb. 12, 2013), J.A. 1345-47. That ratification remedied the Appointments Clause defect in the 2012 Board panel's order. *Cf. ManorCare of Kingston PA, LLC v. NLRB*, 823 F.3d 81, 90 (D.C. Cir. 2016); *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 212-14 (D.C. Cir. 1998).

**C. The Board's Statutory Supervisor Decisions are Supported by Substantial Evidence**

Finally, we address two attacks mounted by Allied against the Board's statutory supervisor classifications. First, Allied contends that the Board erred in classifying all the unit members as non-supervisory under the NLRA. Allied alternatively argues that all "Supervisors" have substantially similar job responsibilities such that, if the other employees deemed eligible to be members of the certified unit are not supervisory, neither are the Training Supervisors.

As the party asserting during the first hearing that the employees were supervisory, Allied bore the burden of proof. *Ky. River Cmty. Care, Inc.*, 532 U.S. at 711-12. We must sustain the Board's decision that Allied failed to carry that burden unless it is "contrary to law, inadequately reasoned, or unsupported by substantial evidence." *Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 276 (D.C. Cir. 2001) (citation omitted). Given the Board's expertise, it enjoys a large measure of discretion on the question. *Nathan Katz Realty, LLC v. NLRB*, 251 F.3d 981, 988 (D.C. Cir. 2001). The Board's findings of fact are conclusive so long as they are "supported by substantial evidence on the record considered as a whole." *See* 29 U.S.C. § 160(f). "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998).

Allied principally argues that the unit members are statutory supervisors because they exercise disciplining authority over other employees. *See* Pet'r Br. at 37-38. Having a role as witnesses, or reporters of fact, within a disciplinary process is legally insufficient to establish the effective exercise of disciplinary authority. *See Nathan Katz Realty*, 251 F.3d at 989; *Ill. Veterans Home at Anna L.P.*, 323 N.L.R.B. 890, 890-91 (1997). Allied's record evidence shows only that the unit members file "reportorial" forms recounting employee misconduct, which are then taken into account by higher-ups who make the disciplinary decisions. In particular, the evidence showed that, under Allied's disciplinary system, unit members can "write up" employees via "irregularity reports," but the reports do not amount to discipline. *See, e.g.*, J.A. 151-52, 688-89. Unit members give their irregularity reports to Jorge Quintero, Allied's discipline adjudicator. *See* J.A. 90-93.

The unit member who files a given report plays a role in substantiating conduct on which discipline might be based, but is "never involved in the ultimate [disciplinary] decision." *See* J.A. 93; *see also* J.A. 91-93, 299-300, 1027. Unit members have the prerogative to counsel employees verbally in lieu of writing irregularity reports. *See* J.A. 356, 400. But neither the discretion to forgo a written report nor the authority to write one suffices to establish independent disciplinary authority on unit members' part. In sum, the record evidence that unit members have the authority as fact witnesses and colleagues to affect the "possibility of discipline" is "not enough to show supervisory status." *Jochims*, 480 F.3d at 1170.

Allied next argues that unit members are supervisors because they direct and are responsible for the performance of hourly personnel. *See* Pet'r Br. at 38-39. Instead of shouldering its burden to prove supervisory status, Allied merely points to the paucity of evidence of *non*supervision. *See id*. at 39. In fact, what relevant evidence there is fails to show that unit members act as supervisors. For example, General Manager Rory McCormack testified that unit members are held accountable for employees' work, but when pressed for details he testified that a unit member would not be held accountable for an employee's mistake; rather the unit member would be held accountable for failing to properly complete his own paperwork. J.A. 166-67. Fueling Supervisor Louis Fiorentino testified that, after a fueler mistakenly overfueled an aircraft on Fiorentino's watch, the fueler, not Fiorentino, was written up because it was the fueler's mistake. J.A. 363-64. Fueling Supervisor Robert Muzikevicius and Maintenance Supervisor Michael Fenton both testified about being written up for their own, not others', mistakes. J.A. 302, 650.

Against the backdrop of the Board's decision that Fueling Supervisors, Tank Farm Supervisors, and Maintenance Supervisors are not statutory supervisors, and so lawfully encompassed within the bargaining unit, Allied also challenges the classification of the three Training Supervisors as statutory supervisors excluded from that unit. We reject Allied's challenge in view of the ample evidence that Training Supervisors are in a separate category from those other "Supervisors" because the Training Supervisors "possess, at the least, the authority to recommend that probationary employees be retained for employment; that these recommendations are routinely followed without independent investigation by others and that such recommendations require the use of independent judgment." Recommended Decision on Challenged Ballots at 16, 22-RC-077044 (Jan. 15, 2013), J.A. 1315.

Training Manager Frank Albanese's testimony supports the finding that Fuel Training Supervisors' recommendations, "without independent investigation by superiors," determine the fate of fueling trainers at Newark. *DirecTV U.S.*, 357 N.L.R.B. 1747, 1749 (2011). The record showed that Albanese places dispositive reliance on the advice of Training Supervisors whether to terminate or retain trainees. J.A. 812-13, 853. In the preceding five years, he "cut" six employees from fueling jobs based solely on recommendations from Training Supervisors without independently investigating the merits of the suggestions. J.A. 1170-1172, 1185.

Not every Training Supervisor testified that he called for termination in so many words, but that does not defeat the Board's finding. Training Supervisor Tommy Skvasik testified that he did not make termination decisions. But Skvasik also testified that Training Manager Albanese relied on Skvasik to tell him whether an employee-in-training could adequately

perform the duties of a fueler, and that Albanese did not make his own inquiry. J.A. 1212-13, 1222. Albanese corroborated the point. *See* J.A. 1168, 1171. Training Supervisor Samuel Harris testified that he never recommended that someone be terminated and he never informed Albanese that a trainee was unable to learn the fueling process. J.A. 1244. But Harris also testified that he spent approximately ninety per cent of his time recertifying employees already on the job. J.A. 1246. He was therefore less likely to encounter trainees who had failed to learn fueling techniques. Neither Skvasik nor Harris's testimony undermines Albanese's account of Training Supervisors' authority over retention and firing decisions. *See* Recommended Decision on Challenged Ballots at 15-16, J.A. 1314-15. "[I]n a given situation, the failure to exercise supervisory authority may indicate only that circumstances have not warranted such exercise." *Beverly Enters.-Mass., Inc. v. NLRB*, 165 F.3d 960, 963 (D.C. Cir. 1999).

Finally, Quintero testified that he, not Albanese, makes final termination decisions, potentially undermining the claim that Training Supervisors' recommendations to Albanese are determinative. J.A. 1290. But Quintero also testified to the direct link between a Training Supervisor's judgment that a trainee was having issues and that trainee's termination or transfer to a different position:

> [T]he training supervisor tells the training manager [*i.e.* Albanese] the issues . . . . [T]he training manager will then come to me, we'll discuss it. . . . [W]e may be able to put him in utility or in another area . . . . [I]f he's not able to be a fueler, for example, we might be able to give him a job as [a] utility person . . . . If we can't do that, then I will sit down with the general manager and we will discuss it.

J.A. 1289-90. The record shows that, no matter which higher-up ultimately acts on it and makes specific reassignment decisions, a Training Supervisor's determination that a trainee cannot perform the fueling functions leads either to reassignment or termination.

During the post-election hearings on the Training Supervisors' status, the Union, as the party asserting supervisory status, carried the burden of proof. *Ky. River Cmty. Care, Inc.*, 532 U.S. at 711-12. The Union met that burden by showing a "direct link" between the Training Supervisor's assessment "and the Employer's decision to retain, continue training, transfer or discharge a probationary employee." *See* Recommended Decision on Challenged Ballots at 13, J.A. 1312. Substantial evidence thus supports the ALJ's conclusion, adopted by the Board, that the Training Supervisors were statutory supervisors ineligible to participate in the representation election for the Union.

\* \* \*

For the foregoing reasons, we deny Allied's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*